BRUCE R. VALE, Appellant, v. GEORGE H. MESSENGER, Superintendent of Banking, Appellee.

BANKS AND BANKING:   Control and Regulation—Certificate of
1   Authorization—Propriety.   The superintendent of banking, upon being "satisfied" that the capital of a duly incorporated bank has been paid up, may not refuse to issue a certificate authorizing the bank to commence business—may not enter upon an investigation as to the *propriety,* wisdom, or possible success of the bank in question.   (Sec. 1864, Code Supp., 1913.)

STATUTES:   Construction—Principles.   The following principles of
2   statutory construction are recognized and applied, to wit:
      1. *Expressio unius est exclusio alterius*—the express mention of one thing implies the exclusion of the other.
      2. The word *"shall,"* when employed in a statute which has

been enacted for the purpose of conferring a *right* or *privilege*, will be construed in a mandatory sense.

**BANKS AND BANKING:** Control and Regulation—Official Authorization. The broad power of the superintendent of banking "to control and supervise" all banks, etc., has sole reference to fully organized and officially authorized banks, and embraces no power to refuse a certificate authorizing the commencement of business, when the conditions precedent to the issuance of such certificate have been fully met. (Sec. 7, Ch. 40, Acts 37 G. A.)

*Appeal from Polk District Court.*—GEORGE WILSON, Judge.

JUNE 27, 1918.

REHEARING DENIED SEPTEMBER 30, 1918.

ON petition praying that defendant be restrained from issuing a certificate to the Bonaparte State Bank, authorizing it to commence business, and that, on final hearing, he be required to ascertain whether the establishment of such an institution would be inimical to the interests of the public, a temporary injunction was issued, as prayed. On motion, the restraining order was dissolved. From this order, plaintiff appeals.—*Affirmed.*

*Robert Sloan, H. B. Sloan, F. W. Sargent,* and *L. H. Salinger,* for appellant.

*H. M. Havner,* Attorney General, *Walker & McBeth,* and *Stipp, Perry, Bannister & Starzinger,* for appellee.

LADD, J.—The department of banking was created by Chapter 40 of the Acts of the Thirty-seventh General Assembly. The defendant is the superintendent of that department.

1. BANKS AND BANKING: control and regulation: certificate of authorization: propriety.

A. V. Blackford and others organized what is known as the Bonaparte State Bank, with 141 shareholders, in the manner prescribed by Section 1863 of the Code. The articles were recorded, and notice of incor-

poration given as therein directed. Its capital of $25,000 was paid up, together with a reserve fund of 10% thereof, of which fact the superintendent of banking was satisfied by a sworn statement of the officers of the bank and the deposit of the money with a depositary approved by him. Thereupon, he was about to issue a certificate, authorizing the corporation to commence business, when plaintiff demanded that the superintendent of banking make investigation, and ascertain whether the interests of the public would be served or impaired by the establishment of said bank in the incorporated town of Bonaparte, and offered to submit proof tending to show that, in the exercise of a sound discretion, the superintendent ought to deny the certificate. The superintendent declined to investigate, or to exercise any discretion in the matter, other than in determining whether the capital had been fully paid in; and so did on the ground that he was without authority to do so. Thereupon, this suit was begun in mandamus, to require him to make such investigation and determine whether any public interest would be jeopardized by opening the bank as is proposed.

The defendant was temporarily enjoined from issuing the certificate to commence business, pending hearing. On motion, the restraining order was dissolved, and this ruling is here for review.

The question presented is not whether the superintendent of banking should deny or issue the certificate, but whether the statutes of this state confer authority to inquire into the propriety of so doing, and whether he should so do, in the proper discharge of his duties. That Bonaparte is a place of about 600 inhabitants, and has two banks,—one a state bank, with a capital stock of $50,000, surplus and undivided profits $20,000, and deposits in the sum of $450,000, and the other a savings bank, with $15,000 capital stock, and about a like amount in deposits,—and other matters, are evidently pleaded to indicate that whether another bank

there would be of any advantage to the public is an open question. If the superintendent has such power, it must be found in the statutes, or fairly be implied therefrom.

Prior to the enactment of Chapter 40 of the Acts of the Thirty-seventh General Assembly, banks and loan and trust companies incorporated under the laws of the state were under the supervision of the auditor of state. The banking department was created by that chapter, and to it were transferred all matters concerning such corporations, formerly dealt with by the auditor of state. The chief officer of the department is styled "superintendent of banking," and Section 2 of said chapter exacts that his selection shall be "solely with regard to his qualifications and fitness to discharge the duties of this position." His powers, aside from those incident to organization, are defined by Section 7 of the act, which may as well be set out:

"The superintendent of banking shall be the head of the banking department of Iowa and shall have general control, supervision and direction of all banks and trust companies incorporated under the laws of Iowa, and shall be charged with the execution of the laws of this state relating to banking; and all powers now vested in and all duties imposed upon the auditor of state relating in any way to banking matters, shall, from and after the taking effect of 'this act, be vested in and made incumbent upon the superintendent of banking herein provided for."

Section 8 requires that:

"All books, records, files, documents, reports and securities, and all papers of every kind and character relating to the business of banking and now enjoined and required by law to be delivered to or to be filed or be deposited with the auditor of state shall, from and after the taking effect of this act, be delivered to and filed or deposited with the said superintendent of banking."

Precisely the extent or limitation of the authority in-

tended to be vested in the superintendent, by the clause giving him "general control, supervision and direction of all banks and trust companies incorporated under the laws of Iowa," need not now be determined. It is enough, for the purposes of this case, that he is "charged with the execution of the laws of this state relating to banking," and is vested with all powers and required to perform all the duties formerly exacted of the auditor of state. These will be found, specified with more or less exactness, in Chapters 10, 11, and 12 of Title IX of the Code, beginning at Section 1841, as subsequently amended; and these were not changed by the Acts of the Thirty-seventh General Assembly, unless this were effected by conferring on the superintendent general control of the banks and trust companies of the state.

Sections 1861 and 1862 of the Code relate to the incorporation of the word "state" in the name of the bank, and Section 1863, to what shall be contained in the articles of incorporation, how they shall be signed and acknowledged, the recording of the same in the office of the secretary of state, and the publication of notice of incorporation. The section following, Section 1864 of the Code Supplement, 1913, provides that:

"No state bank shall be organized under the provisions of this chapter with a less amount of paid up capital than fifty thousand dollars, except in cities or towns having a population not exceeding three thousand, where such association may be organized with a paid up capital of not less than twenty-five thousand dollars. But no such association shall have the right to commence business until its officers or its stockholders shall have furnished to the auditor of state a sworn statement of the paid up capital, and, when the auditor of state is satisfied as to that fact, he shall issue to such association a certificate authorizing it to commence business, and it shall cause said certificate to be published in some newspaper printed in the city or

town where the association is located, once each week, for at least four weeks, or, if no newspaper is published in such city or town, then in a newspaper published nearest thereto in the county."

The meaning of the language of this statute seems manifest. After all exacted by the preceding sections has been accomplished, one very essential thing is lacking, and that is the capital with which to conduct the business proposed. Without this, it is merely an organization on paper. Before it may do business, a certificate so authorizing must be obtained. How? By furnishing the auditor (now the superintendent of banking) a sworn statement by its officers or stockholders that the capital is paid up. "When the auditor of state (superintendent of banking) is satisfied as to that fact," he shall issue the required certificate. Of what fact is he to be satisfied? Plainly enough, that the capital has been paid up.

The auditor is limited to this one inquiry, and by the specification that, when he "is satisfied as to that fact, he shall issue to the association a certificate," all other facts are, by implication, excluded. The maxim *"Expressio unius est exclusio alterius"* is applicable in such cases. *City of Keokuk v. Scroggs,* 39 Iowa 447; *Slane v. McCarroll,* 40 Iowa 61; *McBride v. Des Moines City R. Co.,* 134 Iowa 398; *Carter v. City Council of Council Bluffs,* 180 Iowa 227.

2. STATUTES: construction: principles.

The word "shall," appearing in statutes, is generally construed to be mandatory. Where no right or benefit depends on its imperative use, it may be, and often is, treated as synonymous with "may." The rule of construction is quite clearly expressed in *Wheeler v. City of Chicago,* 24 Ill. 105, quoted with approval in *First Nat. Bank of Helena v. Neill,* 13 Mont. 377 (34 Pac. 180).

"The word 'may' is construed to mean 'shall' whenever

the rights of the public or third persons depend upon the exercise of the power or performance of the duty to which it refers. And so, on the other hand, the word 'shall' may be held to be merely directory, when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to the individual, by giving it that construction. But, if any right to anyone depends upon giving the word an imperative construction, the presumption is that the word was used in reference to such right or benefit. But, where no right or benefit to anyone depends upon the imperative use of the word, it may be held to be directory merely."

See 35 Cyc. 1451, and cases collected.

Here, the right of the corporation to commence business depends on the issuance of the certificate; and denial, or delay even, in so doing, directly interferes with its probable earnings, and is likely to impair the value of its franchise. Denial of the certificate would defeat the enterprise and render nugatory the entire work of incorporation, and thereby deny a right which otherwise would be enjoyed. The cardinal principle of construction is that effect be given, if possible, to intention of the lawmakers; and, where such intention is clearly and plainly expressed, without any ambiguity, in a statute enacted to confer a right or privilege upon compliance therewith, there is no room for construction. *Fry v. Fry,* 125 Iowa 424.

Construing this statute according to the context and the approved usage of words, we entertain no doubt that the word "shall" was designedly used in a mandatory or imperative sense.

Counsel for appellant, however, argue that since, by Section 7, heretofore quoted, the superintendent of banking is given control and supervision of all banks and trust com-

panies, this control and supervision at-
taches upon their organization, prior to the
issuance of the certificate, and, therefore,
preliminary thereto; and that, in the exer-
cise of such powers, the superintendent may
inquire into the propriety of establishing such a bank. The
vice of this argument is that an organization of a corpora-
tion on paper does not constitute it a bank. It is merely
a corporate entity, which may or may not become a bank.
Webster defines "bank" as an establishment for the custody,
loan, exchange, or issue of money. In *Rominger v. Keyes,*
73 Ind. 375, the following definitions are given: By Burrill,
a "house or place where business is carried on;" by Bouvier,
"a place for the deposit of money;" by Wharton, "a place
where money is deposited for the purpose of being let out
at interest, returned by exchange, disposed of to profit, or
to be drawn out again as the owner shall call for it;" and by
Abbott, "an establishment for the custody of money, or for
the loaning and investing of money; or for the issue, ex-
change, and circulation of money; or for more than one or
all of these purposes. The term is applied to the incorpora-
tions or associations authorized to perform such functions;
to the body of directors, or other officers authorized to man-
age its operations; and to the office or place where its busi-
ness is conducted."

Similar definitions will be found in *Kiggins v. Munday,*
19 Wash. 233 (52 Pac. 855); *Hobbs v. National Bank of
Commerce,* 101 Fed. 75 (41 C. C. A. 205); *Reed v. People,*
125 Ill. 592 (1 L. R. A. 324); Morse on Banks (3d Ed.), Sec-
tion 2. These and other authorities plainly indicate that
by "bank" is meant a concern engaged in the banking busi-
ness, and not a mere organization, ready when permission
is granted, to commence such business.

Moreover, the chapter does not purport to change ex-
isting laws, save in the matter of their administration, and

**3. BANKS AND
BANKING :
control and
regulation :
official au-
thorization.**

especially charges the execution of all laws relating to bank-
ing, and imposes on the superintendent of banking the du-
ties previously exacted of the state auditor; and among
these is the issuance of a certificate authorizing the com-
mencement of business, upon satisfactory proof by sworn
statement. We discover nothing in the context indicating
a legislative intent that any other showing may be exacted
by the superintendent of banking as a condition precedent.

As contended by appellant, no one has any vested right
in the privilege of organizing a banking or other corpora-
tion. The general assembly probably might impose such
conditions as it may deem expedient, even to the exaction
of a finding by the department of banking that the estab-
lishment of a bank at a particular locality will be for the
best interests of the community, as a condition to allowing
the corporation to commence business. In several states,
statutes so provide, as do the Federal statutes. See *Schaake
v. Dooley,* 85 Kan. 598 (37 L. R. A. [N. S.] 877, Ann. Cases
1913A, 254) ; *People v. Brady,* 268 Ill. 192 (108 N. E. 1009).
But in this state, such authority has not been conferred. It
is argued, however, that, inasmuch as the superintendent
may close a bank, and cause its affairs to be wound up, un-
der Section 1877 of the Code, he may deny the privilege of
engaging in the banking business by a corporation in cir-
cumstances likely to lead to that result.

*State v. Mosher,* 78 Iowa 321, and like decisions, are re-
lied on. There, the statute authorized the board of medical
examiners to revoke a license to practice medicine for palpa-
ble evidence of incompetency, and the court held that, by
fair implication, said board was authorized to refuse a cer-
tificate on like ground. A mere reading of Section 1877 dis-
closed how slight is the analogy. It provides that:

"When it shall appear to the auditor of state that any
savings or state bank has refused to pay its deposits in ac-
cordance with the terms on which such deposits were re-

ceived, or has become insolvent, or that its capital has become impaired, or has violated the law, or is conducting its business in an unsafe manner, he shall, by an order addressed to such bank, direct a discontinuance of such illegal or unsafe practices, and require conformity with the law. [Here follow provisions with reference to investigation.] If any such bank shall fail or refuse to comply with the demands made by the auditor of state, or if the auditor of state shall become satisfied that any such bank is in an insolvent or unsafe condition, or that the interests of creditors require the closing of any such bank, he may authorize a bank examiner appointed by him to take possession of any such bank, whereupon the right of levy, of execution, or attachment against such bank or its assets shall be suspended, and the auditor of state may, forthwith, with the assent of the attorney general, apply to the district court or judge thereof for the appointment of a receiver for such bank, and its affairs shall be wound up under the direction of the court, and the assets thereof ratably distributed among the creditors thereof, giving preference in payment to depositors."

The matters which will justify the superintendent in taking possession,—i. e., refusal to comply with order, insolvency, unsafe condition, or jeopardy of the interests of creditors,—ordinarily cannot be foretold, and can only be ascertained as they come in the exercise of the franchise to do business after being granted. Who would be so bold as to assert in advance that a particular bank or other enterprise is certain to disobey the law, or to become insolvent or in an unsafe condition, or to jeopardize the interests of those who have trusted it, and on that ground deny it, though possessed of the necessary capital, the right to do business? No one not claiming the possession of prophetic powers; and doubtless for this very reason, the general assembly defined precisely what was to be determined by the

auditor (superintendent) as a condition precedent to the commencement of business.

There is nothing in the point, nor in the discussion concerning Chapter 40's being remedial in character. It merely transferred all matters touched in the three chapters of the Code, from the auditor's department to the department of banking, and conferred the powers and imposed duties heretofore possessed and observed by the auditor of state, upon the superintendent of banking. In a sense, this may be regarded as remedial, but not as affecting statutes prescribing the manner of performing the duties of the office. Possibly, the superintendent may exercise powers in addition to those conferred on the state auditor, though this is doubtful, and not necessarily to be decided. In any event, there was no purpose of amending or adding to the specific powers and duties of the state auditor, as defined in these statutes, and such powers are expressly conferred on the superintendent of banking, and like duties exacted from him. It follows that the trial court did not err in ruling that the superintendent might not exercise any discretion in the matter of issuing a certificate to the Bonaparte State Bank, save in satisfying himself that the capital was paid up, as required, and, on this ground, in dissolving the injunction restraining him from issuing the certificate authorizing the Bonaparte State Bank to commence business. There is no occasion for considering other features of the case touched in argument.—*Affirmed.*

PRESTON, C. J., EVANS and SALINGER, JJ., concur.